**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| DARRELL TRISTAN ANDERSON-BEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:22cv798 |
| | ) | |
| SGT. GRAHAM, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendants' Motion for Summary Judgment" (Docket Entry 13 (emphasis omitted))[1] (the "Motion"). For the reasons that follow, the Court should grant the Motion.

**BACKGROUND**

Alleging violation of his rights under the Eighth Amendment of the United States Constitution and Article I, Section 27 of the North Carolina Constitution during his incarceration at Scotland Correctional Institution (at times, "Scotland CI"), Darrell Tristan Anderson-Bey (the "Plaintiff") sued Sgt. Graham, Sgt. Tolbert, Officer Osuna, Officer Veshinski,[2] and Officer Watts (collectively,

---

1  For legibility reasons, this Opinion uses standardized spelling in all quotations from the parties' materials.

2  Plaintiff spelled this name "Veshinskie" (see, e.g., Docket Entry 2 at 3), but this Opinion uses the correct spelling, omitting the final "e" (see, e.g., Docket Entry 14-5 at 1). [Docket Entry page citations utilize the CM/ECF footer's pagination.]

the "Defendants") pursuant to 42 U.S.C. § 1983.[3]  (See Docket Entry 2 (the "Complaint") at 1-25.)  According to Plaintiff's unverified Complaint (see id. at 10):

"All Defendants," officers with the North Carolina Department of Public Safety (the "NCDPS"),[4] "used [e]xcessive [f]orce against Plaintiff[] and sexually assaulted Plaintiff."  (Id. at 4.)  In particular, at approximately 5:45 a.m. on June 5, 2022, "while Plaintiff was already restrained behind a Restrictive Housing cell door (cell A-10 of the Lower Red Unit/Solitary Confinement), Sgt. Antonio Tolbert . . . administered a burst of O.C. pepper spray into Plaintiff's facial area, through the wicket trap slot" (id. at 5), otherwise known as a handcuff pass (see id. at 5, 14), "during an 'Anticipated Use of Force,' contrary to and in violation of [NCDPS] Policy and Procedures," which mandate videorecording all anticipated uses of force and prohibit using force against, inter alia, an inmate "who is effectively restrained" or "as punishment" (id. at 14 (emphasis omitted)).  "After being pepper sprayed and handcuffed, Plaintiff was escorted pass[ed] shower(s) . . . installed/designed to produce both[] cold and hot water[] and taken

_____

3  "Section 1983 authorizes a plaintiff to sue for an alleged deprivation of a federal constitutional right by an official acting under color of state law."  Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir. 2018) (internal quotation marks omitted).

4  "NCDPS is now [called] NCDAC" (Docket Entry 14-5, ¶ 2), i.e., the "[North Carolina] Department of Adult Corrections" (Docket Entry 14-1 at 1).  As do the parties, this Opinion uses the name in effect at the time of the incident.

2

to a shower room located 100 yards away, within the Intake/Receiving Area, in violation of and contrary to [NCDPS policies,]" which specify that an inmate "subject[ed] to pepper spray will be given an 'immediate opportunity' to flush his or her eyes with water once control has been restored." (Id. at 14-15 (emphasis in original).)

The Intake/Receiving Area showers "only produce hot water," in violation of NCDPS policy providing that "[t]he use of force as punishment is strictly prohibited" and in violation of the Eighth Amendment and Article 1, Section 27. (Id. at 15 (emphasis in original).) In addition, the Intake/Receiving Area shower room contains "a complete BLIND SPOT," in violation of NCDPS policy prohibiting blind spots within the facility. (Id. (emphasis in original).) Once inside the shower room's blind spot, "Officer Osuna, Officer Watts, Officer Veshinski, and Sgt. Graham all entered the shower room after [Plaintiff,] where cameras installed within the Intake/Receiving Area could not see them or [Plaintiff], and remained within the shower room with [Plaintiff] for approximately 2 or 3 minutes." (Id. at 15-16.) Contrary to NCDPS policy that provides for handcuff passes in shower doors to facilitate the secure removal of handcuffs, Plaintiff's "[h]andcuffs were removed while the officers were within the shower room with [Plaintiff]." (Id. at 16; see also id. ("Officers failed to use the handcuff pass.").)

Case 1:22-cv-00798-LCB-LPA   Document 16   Filed 05/30/24   Page 3 of 30

"As [Plaintiff] was facing the shower wall, within the shower room, the handcuffs w[ere] removed, and after [Plaintiff ha]d place[d his] hands (palms) on the shower wall, to show compliance, Officer Osuna beg[a]n to punch Plaintiff . . . on the back of the head area, [al]though Plaintiff had shown no signs of non-compliance, nor aggression, nor aggressiveness." (Id.) "Driven by instinct, [Plaintiff] ducked and spun around, with attempts to defend [him]self, but Officer Watts and Officer Veshinski joined the attack/assault on [Plaintiff,] in violation of" NCDPS policy prohibiting the use of force as punishment. (Id. at 17.) "After Plaintiff was beaten to the floor, Sgt. Graham joined the assault, by striking Plaintiff several times on the right shin . . . with an un-extended baton, leaving swelling and a bleeding wound, in violation of" NCDPS policy, which prohibits the use of force against an inmate who has ceased "resistance or who is effectively restrained" and/or as punishment. (Id.) "Plaintiff's pants w[ere] then stripped off," after which Officer Veshinski and Officer Osuna grabbed Plaintiff's genitals and, after mocking him, Sgt. Graham "struck Plaintiff across the right elbow with the un-extended baton, leaving swelling and a bleeding wound, after[ which Sgt. Graham] roar[ed] with laughter." (Id. at 17-18.) This conduct violated NCDPS policies regarding the use of force. (See id.)

"After the above assault," which lasted approximately two or three minutes, ended, Sgt. Graham "pulled his taser gun out and

aimed it at Plaintiff's face[] as his subordinates exited the shower room. Then Sgt. Graham exited the shower room and the door was closed behind him before or after he'd reholstered the taser." (Id. at 18.) This conduct violated NCDPS policy prohibiting officers from displaying a taser "when force is not otherwise authorized." (Id.) "After the shower room door was closed, Plaintiff was ordered to hand his clothing to staff through the handcuff pass, on the shower room door, which procedures should ha[ve] been executed[] without staff entering the shower room (BLIND SPOT) first with [Plaintiff]." (Id. (emphasis in original).) In other words, "Plaintiff should have been placed inside the shower room by himself, the door then closed behind Plaintiff, and handcuffs removed through the handcuff pass, then clothing requested through [the] handcuff pass." (Id. at 18-19; see also id. at 19 ("Staff never should have entered any 'Blind Spot' with an [inmate]!").)

"After handing Plaintiff's clothing through [the] handcuff pass, Plaintiff was ordered to decontaminate in the hot-torturing shower, which only provides hot water, in violation of" NCDPS policy prohibiting the use of force as punishment. (Id. at 19.) "After the hot-torturing shower, Plaintiff was given towel/boxers-shorts[ and] ordered to walk through [the] metal detector and 'One Eyed Monster.'" (Id.) Sgt. Tolbert then took pictures of Plaintiff "for purposes of [the] Use of Force procedures." (Id.)

5

"Plaintiff was then taken to medical, and as he'd begun to be assessed by Nurse Jernigan, the vital machine beg[a]n to beep repeatedly, refusing to record Plaintiff's vital signs." (Id.) "Nurse Jernigan, who[] had walked away from Plaintiff[] towards [a] counter in Medical, then spun around, and for the first and only time, advised Plaintiff that if he did not remain perfectly still, the vital machine would not record Plaintiff's vital signs." (Id. at 19-20.) "Sgt. Tolbert, desperate for an opportunity to conceal the negligent and [m]alicious [m]isconduct of fellow Sgt. Graham and subordinates, yelled, 'Owp-Owp! He refused! Get his ass up and take him back to the unit!'" (Id. at 20 (stray hyphen omitted).) Plaintiff "quickly responded, 'No, no! I didn't refuse anything! I want to be assessed and treated for my injuries!'" (Id.) "But Sgt. Tolbert insisted that [Plaintiff] had refused, due to the machine refus[ing] to record [his] vital signs." (Id.)

"As Plaintiff was being escorted out of medical[] against his will, Sgt. Tolbert told Nurse Jernigan, 'I'll be back to sign the refusal.'" (Id.) Moreover,

> [alt]hough Sgt. Tolbert had reported the incident to Nurse Jernigan as a Use of Force, he'd only reported the part of the incident where he'd pepper sprayed Plaintiff, leaving out the part where his subordinates jumped Plaintiff in the BLIND SPOT of the shower room, as he stood at the counter within Intake/Receiving Area as [a l]ook-out.

6

(Id. (emphasis in original).)[5]  In contravention of NCDPS policy, Plaintiff was not "allowed to write a statement in relation to the [e]xcessive [u]se of [f]orce."  (Id.)

Subsequently:

> Back on the unit, Plaintiff was placed into the holding cages . . . and when that current shift had retired[] at approximately 6:00 A.M. and Sgt. Hunt[] of the following shift had arrived, Plaintiff showed him the injuries[ he] sustained during the [e]xcessive [u]se of [f]orce committed by the [previous] shift and begged Sgt. Hunt to take him to medical.

> This time at medical, Plaintiff was seen by a different nurse, who[] had witnessed the deprivation of Plaintiff's initial medical treatment attempts.  This time, Plaintiff's wounds were treated with First Aid Antibiotic Ointment, as well as bandages, and X-rays w[ere] ordered for Plaintiff's injuries, which consisted of [] very sore ribs; fresh-bleeding wound, which w[as] swollen on the right shin (leg) area; fresh-bleeding wound, which w[as] swollen on the right elbow[].  Plaintiff still suffers [from] a knot on [his] rib cage, which is believe[d] to have come from the result of being stomped and kicked by correctional officers[] during the [e]xcessive [u]se of [f]orce.

> Video footage of the Intake/Receiving Area on the 5th day of June, 2022, at approximately 5:45 A.M. will support the herein claims . . . .

(Id. at 21 (emphasis and internal quotation marks omitted).)

---

     5    Plaintiff does not, however, raise any claims against Defendants regarding his medical treatment or lack thereof.  (See, e.g., id. at 4, 13 (explaining that "[t]he incident [giving rise to Plaintiff's claims] beg[a]n while [he] was within [his] assigned cell at Scotland Correctional Institution — the incident then transferred . . . to a shower room within the Intake/Receiving Area of Scotland Correctional Institution, and ended there" (parentheticals omitted) (ellipsis in original)).)

Following the close of discovery (see Text Order dated Mar. 26, 2023 (establishing discovery deadline of November 27, 2023)), Defendants moved for summary judgment, arguing that "there exists no genuine issues of material fact which support Plaintiff's claims of alleged violations of his constitutional rights by Defendants" (Docket Entry 13 at 1). In support of the Motion, Defendants offered their affidavits and various documents, including Plaintiff's medical records, an Incident Report, and pictures associated with the underlying incident. (See Docket Entries 14-1 to 14-6.) The following day, the Clerk sent Plaintiff a Roseboro Notice, warning that:

> [Defendants] filed a Motion for Summary Judgment on 12/27/2023, which may or may not be supported by an affidavit.
>
> You have the right to file a 20-page response in opposition to the defendant(s)' motion(s). If defendant(s) filed a motion for summary judgment or filed affidavits, your response may be accompanied by affidavits setting out your version of any relevant disputed material facts or you may submit other responsive material. Your failure to respond or, if appropriate, to file affidavits or evidence in rebuttal within the allowed time may cause the court to conclude that the defendant(s)' contentions are undisputed and/or that you no longer wish to pursue the matter. Therefore, unless you file a response in opposition to the defendant(s)' motion(s), it is likely your case will be dismissed or summary judgment granted in favor of the defendant(s). A response to a motion for summary judgment must be filed within 30 days from the date of service on you.
>
> Any response you file should be accompanied by a brief containing a concise statement of reasons for your opposition and a citation of authorities upon which you rely. You are reminded that affidavits must be made on

8

personal knowledge, contain facts admissible in evidence
and be made by one shown to be competent to
testify. . . .

(Docket Entry 15 at 1.)

Despite this notice, Plaintiff did not respond to the Motion.
(See Docket Entries dated Dec. 28, 2023, to present (lacking
filings from any party).)  Thus, as relevant to the Motion,[6] the
record before the Court reflects the following:

Officer Osuna and Officer Watts both averred that, on June 5,
2022, "the control booth operator noticed that [Plaintiff] was able
to come out of his cell when it was supposed to have been locked,"
so they "were asked to conduct a pull test on [Plaintiff's] door.
When [Plaintiff's] door was pulled on, it opened, which means that
[Plaintiff] had manipulated the door/lock."  (Docket Entry 14-2,
¶ 3; Docket Entry 14-3, ¶ 3.)  "When his door was opened, [they]
saw [Plaintiff] holding a broom stick.  His cell door was closed,
and he was then given a direct order to give [them] the broom
stick.  He refused[,] stating 'whoever spray me will get hit with
this stick.'"  (Docket Entry 14-2, ¶ 3; Docket Entry 14-3, ¶ 3.)

_____

        6  In June 2023, Plaintiff filed a verified "Affidavit of
Fact" (Docket Entry 10 at 1 (emphasis omitted); see id. at 1, 10)
about an incident on June 12, 2023, when the "Assistant Unit
Manager[] Ms. Jernigan appeared at [his] assigned cell door" and
"advised [him] that page #6 to [his] submitted grievance" about the
alleged excessive force incident underlying this lawsuit "w[as]
missing" (id. at 2) and asked "if he had page #6" and/or "would
rewrite [that] page" (id. at 5).  This Affidavit does not discuss
the underlying incident and thus provides no evidence in support of
Plaintiff's excessive force assertions.  (See id. at 1-12.)

They "notified the shift sergeant, Sergeant Tolbert. When Sgt. Tolbert came to [Plaintiff's] cell, he again gave a direct order for [Plaintiff] to give the broom stick to staff. [Plaintiff] again refused. Sgt. Tolbert then administered a short burst of OC Pepper Spray through the wicket door." (Docket Entry 14-2, ¶ 3; Docket Entry 14-3, ¶ 3.) "Shortly thereafter, [Plaintiff] dropped the broom stick and allowed staff to handcuff him. No additional force was used to handcuff [Plaintiff] and remove him from his cell." (Docket Entry 14-2, ¶ 3; Docket Entry 14-3, ¶ 3.)

For their part, Sgt. Graham and Officer Veshinski "did not witness the incident in [Plaintiff's] cell," but were "asked to assist in escorting [Plaintiff] to the Receiving area to be decontaminated, strip-searched, and medically evaluated." (Docket Entry 14-5, ¶ 3; Docket Entry 14-6, ¶ 3.) Sgt. Graham and Officers Veshinski, Watts, and Osuna escorted Plaintiff "to the Receiving area, where he was strip-searched and decontaminated." (Docket Entry 14-2, ¶ 4; Docket Entry 14-3, ¶ 4; <u>accord</u> Docket Entry 14-5, ¶ 4; Docket Entry 14-6, ¶ 4.) "Staff did not use any force on [Plaintiff] during the strip-search or decontamination. Specifically, neither [they] nor any other staff member punched, beat, kicked, hit, or assaulted [Plaintiff]. Furthermore, neither [they] nor any other staff member grabbed Plaintiff's penis or testicles." (Docket Entry 14-2, ¶ 4; Docket Entry 14-3, ¶ 4; Docket Entry 14-5, ¶ 4; Docket Entry 14-6, ¶ 4.) "During the

search of [Plaintiff], a homemade weapon was located in his clothing. After he was decontaminated and searched, [Plaintiff] was given fresh clothes and photographed. After he was decontaminated and searched, [they] did not notice any injuries to [Plaintiff]." (Docket Entry 14-2, ¶ 4; Docket Entry 14-3, ¶ 4; Docket Entry 14-5, ¶ 4; accord Docket Entry 14-6, ¶ 4.)

Meanwhile, Sgt. Tolbert avers that, when staff conducted the pull test on Plaintiff's door following the control booth operator's discovery that Plaintiff "was able to come out of his cell when it was supposed to have been locked" (Docket Entry 14-4, ¶ 3), "they noticed that [Plaintiff] had a broom stick in his hand. As the shift sergeant, [Sgt. Tolbert] was asked to report to the area because [Plaintiff] refused to drop the broom stick and made threats to correctional staff." (Id.) "When [Sgt. Tolbert] got to [Plaintiff's] cell, [Sgt. Tolbert] gave [Plaintiff] a direct order to give the broom stick to staff, but he refused. [Sgt. Tolbert] administered a short burst of OC Pepper Spray through the wicket door." (Id.)[7] "Shortly thereafter, [Plaintiff] dropped the broom stick and allowed staff to handcuff him. No additional force was used to handcuff [Plaintiff] and remove him from his cell." (Id.)

---

7    Per the related Incident Report, "Sergeant Tolbert administered a one and one half second burst of OC Pepper Spray towards [Plaintiff's] facial area through the wicket door." (Docket Entry 14-1 at 12.)

"[Plaintiff] was escorted out of the pod to the Receiving area. As that occurred, [Sgt. Tolbert] went back to [Plaintiff's] cell to obtain the broom stick and broom head. [Sgt. Tolbert] then took those items to the OIC's office." (Id., ¶ 4.)[8] "When [Sgt. Tolbert] returned to the Receiving area, [Plaintiff] was finishing up his decontamination shower and had already been strip-searched. [Plaintiff] was given a fresh set of clothes." (Id.) "While [Sgt. Tolbert] was in the Receiving area with [Plaintiff], [Sgt. Tolbert] did not see any correctional staff member punch, hit, kick, or assault [Plaintiff], nor did [Sgt. Tolbert] see any correctional staff member grab [Plaintiff's] penis or testicles. [Sgt. Tolbert] did not notice any injuries to [Plaintiff]." (Id.)

Defendants "then assisted in escorting [Plaintiff] to main medical. While in main medical, [Plaintiff] refused orders to sit still so that his vitals could be taken. The nurse attempted to take his vital signs multiple times, but was unable to do so due to [Plaintiff's] refusal to comply with instructions." (Docket Entry 14-2, ¶ 5; Docket Entry 14-3, ¶ 5; Docket Entry 14-4, ¶ 5; Docket Entry 14-5, ¶ 5; Docket Entry 14-6, ¶ 5.) "Specifically, [Plaintiff] continued to move and attempted to stand up multiple times. Generally, [Plaintiff] was being disruptive. At this

---

8 "OIC" signifies officer in charge. See, e.g., Grady v. Smith, No. 1:20cv54, 2023 WL 130802, at *3 (M.D.N.C. Jan. 9, 2023), report and recommendation adopted, No. 1:20cv54, 2023 WL 3743095 (M.D.N.C. Feb. 17, 2023).

point, the nurse stated that she would not be able to assess [Plaintiff] and he was removed from the medical unit." (Docket Entry 14-2, ¶ 5; Docket Entry 14-3, ¶ 5; Docket Entry 14-4, ¶ 5; Docket Entry 14-5, ¶ 5; Docket Entry 14-6, ¶ 5.) Defendants "then assisted in escorting [Plaintiff] to a Restrictive Housing holding cell." (Docket Entry 14-2, ¶ 5; Docket Entry 14-3, ¶ 5; Docket Entry 14-4, ¶ 5; Docket Entry 14-5, ¶ 5; Docket Entry 14-6, ¶ 5.)

"At Scotland CI, after an inmate is sprayed with OC Pepper Spray, the policy requires them to be decontaminated." (Docket Entry 14-2, ¶ 6; Docket Entry 14-3, ¶ 6; Docket Entry 14-4, ¶ 6; Docket Entry 14-5, ¶ 6; Docket Entry 14-6, ¶ 6.) "In 2022, it was recommended by Scotland CI administration to decontaminate inmates using the decontamination shower in the Receiving area. From the housing units to the Receiving area, it is only a short distance, taking less than five minutes to walk there." (Docket Entry 14-2, ¶ 6; Docket Entry 14-3, ¶ 6; Docket Entry 14-4, ¶ 6; Docket Entry 14-5, ¶ 6; Docket Entry 14-6, ¶ 6.)

"[Plaintiff] is just another inmate to [Defendants]. [Defendants] did not then, and do not now, hold any feelings of ill-will towards him. [Defendants] have never wanted to harm [Plaintiff]. By completing the above actions, [Defendants] w[ere] merely performing [their] correctional staff duties." (Docket Entry 14-2, ¶ 7; Docket Entry 14-3, ¶ 7; Docket Entry 14-4, ¶ 7; Docket Entry 14-5, ¶ 7; Docket Entry 14-6, ¶ 7.)

13

Four pictures of Plaintiff following the incident appear in the record, showing him from all sides. (See Docket Entry 14-1 at 31-34.)  In the pictures, Plaintiff stands with his hands cuffed behind his back, wearing a grey t-shirt, white shorts, and white socks. (See id.)  Because of the distance between the photographer and Plaintiff, the pictures do not clearly show if Plaintiff bears any injuries. (See id.)  However, red stains the upper portion of Plaintiff's right sock, as well as, it appears, Plaintiff's leg above the sock. (See id. at 31, 34.)  The pictures also appear to show red on the inner portion of Plaintiff's right arm below his elbow. (See id. at 33.)

The first medical report, created by Nurse Lillian Jernigan as the "Provider," reflects that at 6:05 a.m. on June 5, 2022, Plaintiff appeared for a "Use of Force Evaluation encounter at Clinic." (Id. at 38.)  That report further indicates that such evaluation was "Not Done" because "Refused." (Id. (emphasis omitted).)  The report then states:

> Offender verbally refused USE OF FORCE/TRAUMA ASSESSMENT and PEPPER SPRAY assessment.  Offender was alert and oriented to person, place, and time.  Able to verbalize needs.  Ambulates without difficulty.  No signs/symptoms of distress noted, respiratory or otherwise.  No injuries observed and/or reported by offender.  Offender decontaminated in RECEIVING.  Offender was removed from Main Medical due to noncompliance with this Nurse's instructions/requirements necessary for assessment.  Offender escorted out of Main Medical by Custody Staff.  OIC aware[.]

(Id. (capitalization as in original).)

14

The second medical report, for a "Self Declared Emergency encounter performed at Clinic" at 7:30 a.m. on June 5, 2022 (<u>id.</u> at 39), however, indicates that Plaintiff displayed wounds to his right elbow and shin (<u>see id.</u> at 39-40). In the "Chief Complaint" section, the report states:

> "Look I ain't refused medical matter of fact wasn't you in here earlier when nurse Jernigan saw me"
>
> "I got my ass beat by a 400lb man and that's the first tort claim"
>
> "I was decontaminated with hot water and that's against policy so tort claim number two"
>
> "Then I wasn't even fighting back and they beat me matter of fact look at my leg where I was beat with a baton"

(<u>Id.</u> at 39.) The report notes that Plaintiff "[a]ppears in [p]ain, [with v]isible [i]njury" (<u>id.</u> at 40), complaining of "pain to elbow, tibial region[,] and ribs" (<u>id.</u> at 41), but does not "[a]ppear[] in [d]istress" (<u>id.</u> at 40).

The report continues:

> Patient escorted to main medical with custody for evaluation after use of force hands on and OC spray.
>
> Patient alert and oriented, able to make needs known, decontaminated prior to this writer's assessment.
>
> Denies any [shortness of breath]. Patient previously declined assessment (approximately 30 to 45 minutes) at shift change.
>
> Patient has multiple complaints of pain and wounds (as listed above). Assessment of right mid-tibial region shows tenderness with light palpation and approximately 8cm circular area surrounding the above named wound. Ice applied at this time. Patient has edema to right elbow with tenderness to light palpation. Patient reports left

15

> rib pain.  Area is tender to touch, no edema and slight
> redness noted at this time.  No obvious trauma noted.

> Wounds cleansed with warm water and Betasept followed by
> Polysporin and band-aid.

(Id. at 41 (emphasis omitted).)  The report further reflects that Plaintiff should take ibuprofen and ice his injuries, indicates the provision of two band-aids, and orders x-rays of Plaintiff's elbow and ribs.  (Id. at 41-42.)  Finally, the report notes Plaintiff's "Discharge[] to Housing Unit[ with ]No Restrictions."  (Id. at 42.)

Finally, the radiology reports indicate that "[m]ultiple views of the left ribs do not show any underlying fracture, lytic or blastic lesions, or any other abnormality."  (Id. at 44; see also id. ("Normal left ribs.").)  They further indicate that Plaintiff's "[r]ight tibia and fibula" and the "bones of [his] right elbow are intact without fracture," for "[n]ormal evaluation[s of the] right lower leg" and "right elbow."  (Id. at 45-46.)

## DISCUSSION

### I. Relevant Standards

#### A. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[9]  A genuine dispute of material fact exists "if the

---

9  "[I]n considering a motion for summary judgment, the district court *must* review the motion, even if unopposed, and determine from what it has before it whether the moving party is

16

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, and all internal conflicts in it resolved favorably to him." Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets and internal quotation marks omitted). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Moreover, "the non-moving party may not rely on beliefs,

---

entitled to summary judgment as a matter of law." Robinson v. Wix Filtration Corp., 599 F.3d 403, 409 n.8 (4th Cir. 2010) (emphasis in original) (internal quotation marks omitted).

Case 1:22-cv-00798-LCB-LPA   Document 16   Filed 05/30/24   Page 17 of 30

conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, No. 4:08cv2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Baber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010). Further, factual allegations in a complaint or other court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

**B. Eighth Amendment Standards**

"The Eighth Amendment protects prisoners from unnecessary and wanton infliction of pain." Thompson v. Virginia, 878 F.3d 89, 97 (4th Cir. 2017) (internal quotation marks omitted). "That protection imposes on prison officials an affirmative 'obligation to take reasonable measures to guarantee the safety of . . . inmates.'" Id. (ellipsis in original) (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)). Accordingly, in evaluating an eighth-amendment excessive force claim, the Court "must determine 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. at 98 (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)). In conducting this analysis, the Court considers "whether the prison official acted with a sufficiently culpable state of mind

18

(subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008) (internal quotation marks omitted).

Notably, a prisoner need not suffer a significant injury to prevail on an excessive force claim. See Thompson, 878 F.3d at 98; see also Hudson, 503 U.S. at 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident." (citation omitted) (citing Whitley, 475 U.S. at 327)). "The excessive force analysis thus focuses on the maliciousness of the force used, not the severity of the injury that results from that force." Thompson, 878 F.3d at 101; see also Wilkins v. Gaddy, 559 U.S. 34, 38 (2010) ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.").[10]

As for the subjective component, "[t]he state of mind required in excessive force claims is 'wantonness in the infliction of pain.'" Iko, 535 F.3d at 239 (quoting Whitley, 475 U.S. at 322); see also id. ("Put differently, the 'core judicial inquiry'

_____

10  Although "an excessive force plaintiff need not show significant injury, the extent of injury may supply insight as to the force applied." Cowart v. Erwin, 837 F.3d 444, 453 (5th Cir. 2016).

19

regarding the subjective component of an excessive force claim is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" (quoting Hudson, 503 U.S. at 7)). The United States Supreme Court has identified four factors to assist courts in determining whether an officer acted with "'wantonness'":

> (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) "any efforts made to temper the severity of a forceful response."

Id. (quoting Whitley, 475 U.S. at 321). "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley, 475 U.S. at 321.

## C. Article I, Section 27 Standards

Under the North Carolina Constitution, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted." N.C. Const. art. I, § 27. As such, "Article I, Section 27 of the North Carolina Constitution provides a prohibition similar to the Eighth Amendment's Cruel and Unusual Punishment Clause." Medley v. North Carolina Dep't of Corr., 330 N.C. 837, 844, 412 S.E.2d 654, 659 (1992). However, a "textual distinction [exists] between article I, section 27, which prohibits

20

punishment that is 'cruel *or* unusual,' and the Eighth Amendment, which prohibits punishment that is 'cruel *and* unusual.'" <u>State v. Kelliher</u>, 381 N.C. 558, 579, 873 S.E.2d 366, 382 (2022) (emphasis in original).  "For th[is and other] reasons, [the North Carolina Supreme Court has] conclude[d] that article I, section 27 of the North Carolina Constitution need not be interpreted in lockstep with the Eighth Amendment to the United States Constitution." <u>Id.</u> at 584, 873 S.E.2d at 385.  Notably, though, the North Carolina Supreme Court has further explained:

> Although the two provisions need not be interpreted in lockstep, the Eighth Amendment to the United States Constitution and article I, section 27 of the North Carolina Constitution do share one important similarity: neither precisely defines the terms "cruel" or "unusual." *See State v. Driver*, 78 N.C. 423, 429 (1878) (explaining that while the North Carolina Constitution does impose "a limit to the power of the [j]udge to punish . . . [w]hat the precise limit is, cannot be prescribed").  What is clear from the plain meaning of both terms is that determining whether a punishment is "cruel" or "unusual" requires a contextual inquiry, the results of which may change over time as society evolves.  Thus, we are persuaded that, at this time, there is no reason to depart from the basic Eighth Amendment analytical framework as articulated by the United States Supreme Court in cases like *Trop* [*v. Dulles*, 356 U.S. 86 (1958)] and *Graham* [*v. Florida*, 560 U.S. 48 (2010)] and described above.  We draw the meaning of article I, section 27 "from the evolving standards of decency that mark the progress of a maturing society," *Trop*, 356 U.S. at 100-01, and we consider "objective indicia of society's standards" when we "exercise [our] own independent judgment [to decide] whether the punishment in question violates the Constitution," *Graham*, 560 U.S. at 61.

<u>Kelliher</u>, 381 N.C. at 584, 873 S.E.2d at 385 (ellipsis and certain brackets in original) (parallel citations omitted).

21

Notably, <u>Kelliher</u> involved the issue of life sentences for juvenile offenders, <u>see</u> <u>id.</u> at 560, 873 S.E.2d at 370, an area that

> has been a fertile ground for change over the past several decades as the Supreme Court of the United States, lower federal courts, and the appellate courts of North Carolina have been consistently beckoned to consider and address the continually evolving societal view of juveniles in the criminal justice system as well as the ongoing discoveries via scientific research regarding the special vulnerabilities and developmental malleability of youthful offenders,

<u>State v. Conner</u>, 381 N.C. 643, 659, 873 S.E.2d 339, 349 (2022). By contrast, this case involves routine allegations of excessive force that present no grounds for departing from North Carolina courts' "historical[]" practice of "analyz[ing] cruel and/or unusual punishment claims by criminal defendants the same under both the federal and state Constitutions," <u>id.</u> at 668, 873 S.E.2d at 355 (internal quotation marks omitted).

## **II. Analysis**

As an initial matter, "prison officials' failure to follow internal prison policies are not actionable under § 1983 unless the alleged breach of policy rises to the level of a constitutional violation." <u>Jackson v. Sampson</u>, 536 F. App'x 356, 357 (4th Cir. 2013). "Therefore, any failure by prison officials to follow [NCDPS] policies is insufficient, without more, to support [Plaintiff's] claim[s]." <u>Id.</u> at 358; <u>see also, e.g.,</u> <u>Sims v. Frye</u>, No. CV 1:23-4260, 2023 WL 7346876, at *2 (D.S.C. Oct. 13, 2023) ("Violations of internal procedural regulations or even state law

22

by prison officials do not provide a basis for a constitutional claim under § 1983 unless the Constitution independently protects the right or procedure at issue."), report and recommendation adopted, No. CV 1:23-4260, 2023 WL 7326556 (D.S.C. Nov. 7, 2023).

Moreover, because Plaintiff failed to verify his Complaint or otherwise submit any sworn statements in support of his excessive force allegations, the record contains no evidence that any Defendants assaulted Plaintiff in the Receiving Area shower. See Reeves, 2011 WL 4499099, at *5 n.14 (explaining that unsworn statements do not constitute evidence for summary judgment purposes). Instead, the only evidence in the record reflects that nobody assaulted Plaintiff in the shower. (See Docket Entry 14-2, ¶ 4; Docket Entry 14-3, ¶ 4; Docket Entry 14-5, ¶ 4; Docket Entry 14-6, ¶ 4; see also Docket Entry 14-4, ¶ 4.) Further, the mere fact that, construing the evidence in the light most favorable to Plaintiff, the pictures and one of the post-incident medical reports indicate that Plaintiff displayed injuries following his shower and a "hands on" use of force (Docket Entry 14-1 at 41; see id. at 31, 33, 34, 39-43) does not salvage Plaintiff's claim, for "[t]o establish personal liability under § 1983, . . . the plaintiff must affirmatively show that the official charged acted personally in the deprivation of the plaintiff's rights. That is, the official's own individual actions must have violated the Constitution." Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir.

23

2018) (brackets, citation, and internal quotation marks omitted).

Because the <u>evidence</u>, even construed in Plaintiff's favor, remains

"insufficient to show that [any Defendants] w[ere] personally

involved in any" assault of Plaintiff in the shower, "no reasonable

trier of fact could find that [Defendants'] 'own individual

actions' violated the Constitution." Id. at 172. "Accordingly,

[Defendants a]re entitled to summary judgment on [this excessive

force claim] because they lacked sufficient personal involvement in

the alleged constitutional deprivation[]." Id.

Plaintiff's decontamination-related allegations fare no

better. Even accepting Plaintiff's allegations, less than twenty

minutes elapsed between the time that Sgt. Tolbert pepper-sprayed

Plaintiff and his decontamination shower in the Receiving Area.

(See, e.g., Docket Entry 2 at 5, 21 (alleging that incident

occurred "at approximately 5:45 A.M." and that, by "approximately

6:00 A.M.," Plaintiff had returned to his unit after showering and

visiting medical); see also, e.g., Docket Entry 14-1 at 11

(specifying incident time of 5:45 a.m. on Incident Report), 38

(indicating first medical encounter post-incident occurred at 6:05

a.m.); Docket Entry 14-2, ¶¶ 3, 4, 6 (averring that, shortly after

pepper-spraying, officers escorted Plaintiff to decontamination

shower in Receiving Area, a location "only a short distance" away,

"taking less than five minutes to walk there").) In addition, the

record contains neither evidence nor allegations that Plaintiff

24

(1) suffered anything other than "the usual transitory effects of pepper spray," Moskos v. Hardee, 24 F.4th 289, 298 (4th Cir. 2022), or (2) could not wash off the pepper spray due to the shower's temperature.  (See generally Docket Entries 2, 14-1.)  "In circumstances such as these, involving a short delay in decontamination, without any aggravating factors such as a serious medical reaction, courts have consistently found that the [requirements for an eighth-amendment claim[11] are] not satisfied." Moskos, 24 F.4th at 298.

Accordingly, Plaintiff's decontamination-related claim cannot proceed.  See id. (concluding that, where "[the plaintiff] experienced the usual transitory effects of pepper spray for a

---

11 Courts frequently assess decontamination-related eighth-amendment claims under the "deliberate indifference" rather than "excessive force" classification, see, e.g., Moskos, 24 F.4th at 293-94, 297-98; Duncan v. McKenzie, No. CV 15-736, 2016 WL 1597103, at *5-8 (D. Md. Apr. 20, 2016) (analyzing allegations regarding spraying of pepper spray under excessive force standards and allegations regarding decontamination under deliberate indifference standards), aff'd, 670 F. App'x 119 (4th Cir. 2016), although they have also considered them under the "excessive force" classification, see, e.g., Mann v. Failey, 578 F. App'x 267, 271-74 (4th Cir. 2014); regardless, the determinative question remains the same: did the defendants inflict "cruel and unusual punishment[,]" U.S. Const. amend. VIII, on the plaintiff, see Iko, 535 F.3d at 238.  Under either approach, the circumstances of this case do not rise to the level of a constitutional violation.  Cf. Mann, 578 F. App'x at 273-74 (concluding evidence could support finding that guards "acted maliciously, sadistically, and in violation of the Eighth Amendment" where evidence, viewed in light most favorable to the plaintiff, "clearly reflects a prisoner in pain for several hours and a cadre of officers who refused to allow him to decontaminate," one of whom "told [the prisoner] that he would 'be lucky if he ever got to decontaminate after what [he'd] done'" (emphasis and final set of brackets in original)).

period of, at most, 90 to 120 minutes . . . . without any aggravating factors such as a serious medical reaction," his constitutional claim failed "as a matter of law"); see also Duncan v. McKenzie, No. CV 15-736, 2016 WL 1597103, at *7-8 (D. Md. Apr. 20, 2016) (concluding that staff did not violate the plaintiff's constitutional rights where the plaintiff received hot decontamination shower after pepper-spraying, noting that, "[a]lthough the water in the shower may have been hot, there is no evidence that [the plaintiff] was unable to use some of the water to wash himself"), aff'd, 670 F. App'x 119 (4th Cir. 2016).

As for Plaintiff's claim regarding the use of pepper spray, the record establishes that, after discovering that Plaintiff had disabled the lock on his cell door, officers observed Plaintiff holding a broom stick in his cell. (See, e.g., Docket Entry 14-3, ¶ 3.) Plaintiff then disobeyed a direct order to give officers the broom stick, instead telling them "'whoever spray[ed him] will get hit with this stick.'" (Id.) Because of Plaintiff's refusal to relinquish the broom stick and his threat to staff, Sgt. Tolbert reported to the area and gave Plaintiff another "direct order to give the broom stick to staff, but [Plaintiff] refused." (Docket Entry 14-4, ¶ 3.) Sgt. Tolbert then "administered a short burst of OC Pepper Spray through the wicket door," after which Plaintiff "dropped the broom stick and allowed staff to handcuff him. No

additional force was used to handcuff [Plaintiff] and remove him from his cell." (Id.)

As for the first three Whitley factors, "the need for the application of force," "the relationship between the need and the amount of force that was used," and "the extent of any reasonably perceived threat that the application of force was intended to quell," Iko, 535 F.3d at 239 (internal quotation marks omitted), the record thus establishes that, after tampering with the lock on his cell door, Plaintiff ignored repeated orders to relinquish the broom stick — a weapon — and instead threatened staff with that weapon. The record further reflects that only after Plaintiff disobeyed a second direct order did Sgt. Tolbert administer a short (less than two-second (see Docket Entry 14-1 at 12)) burst of pepper spray, after which Plaintiff dropped his weapon and submitted to handcuffing without further use of force.

"Force may be used when there is a threat to an officer's physical safety or in an attempt to preserve internal order by compelling compliance with prison rules and procedures." Johnson v. Meadows, No. 5:19-CT-03131, 2022 WL 7252508, at *4 (E.D.N.C. Sept. 29, 2022) (internal quotation marks omitted), appeal filed, No. 22-7175 (4th Cir. Oct. 12, 2022); see also, e.g., Brooks v. Johnson, 924 F.3d 104, 113 (4th Cir. 2019) ("Corrections officers act in a 'good faith effort to maintain or restore discipline' — that is, with a permissible motive — not only when they confront

27

immediate risks to physical safety, but also when they attempt to 'preserve internal order' by compelling compliance with prison rules and procedures."). Here, Plaintiff's continuing possession of a weapon, which he threatened to use against officers and which he refused to relinquish voluntarily, endangered others, necessitating some use of force. See, e.g., Grayson v. Peed, 195 F.3d 692, 696 (4th Cir. 1999) (deeming force justified where inmate "stuck his arm through the slot, thereby posing a danger to officers who might walk by his cell" and "refused to relent, even after repeated entreaties"). Moreover, "Plaintiff's undisputed refusal to comply with [the officers' orders] justified some need for force to restore order." Geddings v. Roberts, No. 1:15cv264, 2018 WL 1626116, at *10 (M.D.N.C. Mar. 30, 2018) (explaining that "[c]ase law . . . support[s] that '[a] prisoner's failure to comply with an officer's order permits the officer to use some measure of force to gain the prisoner's compliance or to respond to a threat that arises because of the prisoner's failure to comply'" (final set of brackets in original) (collecting cases)); see also, e.g., Danley v. Allen, 540 F.3d 1298, 1307 (11th Cir. 2008) ("A short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders."). Accordingly, the first three Whitley factors favor Sgt. Tolbert.

The final factor, "any efforts made to temper the severity of a forceful response," Whitley, 475 U.S. at 321, likewise weighs in

28

Sgt. Tolbert's favor.  The record reflects that Sgt. Tolbert first attempted to gain Plaintiff's disarmament through a verbal order and only administered a short burst of pepper spray when Plaintiff refused that order.  To paraphrase the Fourth Circuit:

> [pepper spray] can be constitutionally used in small quantities . . . to control a "recalcitrant inmate."  A limited application of [pepper spray] may be "much more humane and effective than a flesh to flesh confrontation with an inmate."  Moreover, prompt washing of the [pepper-sprayed] area of the body will usually provide immediate relief from pain.  Furthermore, because a limited use of [pepper spray] constitutes a relatively "mild" response compared to other forms of force, [Sgt. Tolbert's] application of [a short burst of pepper spray] indicates a "tempered" response by the prison officials.[12]

Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996).[12]

Under the circumstances, "no reasonable jury could find that [Sgt. Tolbert's] use of force was applied maliciously and sadistically for the very purpose of causing harm." Geddings, 2018 WL 1626116, at *10.[13]  The Court should therefore grant summary judgment to Sgt. Tolbert on Plaintiff's excessive force claim.[14]

---

12  "In Williams, guards used CS tear gas, the type used by the military, to subdue the plaintiff. . . . By contrast, in the present case, the officers used OC pepper spray which is milder than the tear gas used in Williams." Mann v. Failey, No. CA 0:11-2232, 2013 WL 841374, at *4 (D.S.C. Mar. 6, 2013), aff'd in part, vacated in part, 578 F. App'x 267 (4th Cir. 2014).

13  Accordingly, the Court need not analyze whether Plaintiff satisfies the objective component of an eighth-amendment excessive force claim.

14  Because Sgt. Tolbert did not violate Plaintiff's constitutional rights, no pepper-spray-related bystander liability claim exists against any other Defendants.  See Randall v. Prince George's Cnty., 302 F.3d 188, 203 (4th Cir. 2002) (explaining that,

29

<u>**CONCLUSION**</u>

The record establishes that Defendants did not violate Plaintiff's constitutional rights (federal or state).

**IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 13) be granted.

This 30th day of May, 2024.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

---

"if a bystanding officer (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, he may be deemed an accomplice and treated accordingly").